IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Theron Miller, | ) | |
| | ) | Civil Action No. 8:10-1142-HMH-JDA |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION OF** |
| | ) | **MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for disability insurance benefits. For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

On May 9, 2007, Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, alleging that he became disabled on January 20, 2004 [R. 85–89, 110]. After initial and reconsideration denials of the claim [R. 58–63, 65–68, 70–71], and a de novo hearing [R. 19-47], Administrative Law Judge ("ALJ") Glen H. Watkins issued an unfavorable decision on September 10, 2009, finding Plaintiff not disabled [R 9–18]. The Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision. [R 1–3.] Thus, the

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

ALJ's decision became final, and this case is ripe for judicial review pursuant to 42 U.S.C. § 405(g). *See* 20 C.F.R.§ 404.981.

The only issues before the Court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

### THE PARTIES' POSITIONS

Plaintiff contends that the ALJ committed error by finding that (1) Plaintiff's depression and anxiety were not a severe impairments; (2) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments; (3) Plaintiff had the residual functional capacity to perform less than a full range of medium work; (4) there are jobs that exist in the national economy that Plaintiff could perform; and (5) Plaintiff was not under a disability.

The Commissioner asserts that the decision is supported by substantial evidence and free of harmful legal error.  The Commissioner contends that diagnostic scans throughout the record consistently showed no sign of brain trauma, and several psychologists concluded that Plaintiff appeared to be malingering on tests of his cognitive functioning.  Moreover, the Commissioner contends that Plaintiff continued to engage in normal activities and that the overall picture presented by the record is of an individual whose impairments were not so debilitating as to preclude simple, repetitive, medium-exertion work with restrictions on exposure to hazards, climbing, balancing, stooping, kneeling, crouching, and crawling.

In making his determination that Plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge [R.1] as follows:

> Utilizing the Commissioner's five-step sequential evaluation process for evaluating disability in adults (*see* 20 C.F.R. § 404.1520), the ALJ considered all the evidence and concluded that Plaintiff's impairments, though limiting, were not disabling [R. 9-18].  At steps one through three, the ALJ found that Plaintiff had not performed substantial gainful activity since

2

the alleged onset date of disability, that he had "severe" impairments (post-traumatic headaches, hepatitis B, and closed head injury), and that his impairments did not meet or equal the criteria of any impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1 (the listings), so as to be *per se* disabling [R. 11-13, Findings 2-4]. Next, the ALJ found that Plaintiff's subjective complaints of disabling limitations were not fully credible, and that he had the residual functional capacity to perform a range of medium work involving only simple, repetitive tasks; no climbing of ladders, ropes, or scaffolds; no more than occasional balancing; no more than frequent (as opposed to constant) stooping, kneeling, crouching, and crawling; and no concentrated exposure to hazards [R. 13-17, Finding 5]. At steps four and five, the ALJ found Plaintiff could not perform his past relevant work, but could perform other jobs in the national economy, including janitor/cleaner, dining room attendant, and kitchen helper/dishwasher [R. 17-18, Findings 6-10]. Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act [R. 18, Finding 11].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "'allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ),'" not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.

1987)); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g., Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was

4

appropriate where the ALJ failed to develop a full and fair record of the plaintiff's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the plaintiff disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[2]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

---

[2]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g., Ashton v. Astrue*, No. 6:10-cv-152, 2010 WL 5478646, at *8 (D.S.C. Nov. 23, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

I.    **The Five Step Evaluation**

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).    The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.    20 C.F.R. § 404.1520.    Through the fourth step, the burden of production and proof is on the claimant.    *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).    The claimant must prove disability on or before the last day of her insured status to receive disability benefits.    *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).    If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.    *Id.*    If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.    20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, 20 C.F.R. 404.1572(b).    If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity.    20 C.F.R. §§ 404.1574, 404.1575.

7

**B.**    ***Severe Impairment***

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B).

**C.**    ***Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).

**D.**    ***Past Relevant Work***

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the

8

claimant's residual functional capacity[3] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.   *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. § 404.1520(f); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[4]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. § 404.1569a (2001); *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform

---

[3]Residual functional capacity is "the most [a claimant] can do despite [his] limitations."  20 C.F.R. § 404.1545(e).

[4]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a.  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  *Id.*

specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such psychiatrists and psychologists, and facilities such as hospitals and clinics. See  20 C.F.R. § 404, Subpt. P, App. 1, Listing of Impairments, § 12.00 Mental Disorders. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.07.  Adequate descriptions of functional limitations must be obtained from these or other sources which may include programs and facilities where the individual has been observed over a considerable period of time. See, Long v. U.S. Department of Health and Human Services, 902 F.2d 1565 (4th Cir. 1990)(unpublished opinion).

Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands

10

(stress). This information can be provided by programs such as community mental health centers, day care centers, sheltered work-shops, etc. It can also be provided by others, including family members, who have knowledge of the individual's functioning. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerable over time. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D).

Particular problems are often involved in evaluating mental impairments in individuals who have long histories repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. It is mandatory to attempt to obtain adequate descriptive information from

11

all sources which have treated the individual either currently or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P., App. 1, 12.00(E).

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594(iv).

## III.    Treating Physicians

The opinion of a claimant's treating physician must "be given great weight and may be disregarded only if there is persuasive contradictory evidence" in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Foster v. Heckler*, 780 F.2d 1125, 1130 (4th Cir. 1986) (holding that a treating physician's testimony is entitled to great weight because it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time); *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983)). If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence. *Craig*, 76 F.3d at 590. Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See id.* (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

12

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See  Mitchell*, 699 F.2d at 187 (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(d)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir.1986) (citing *Gordon*, 725 F.2d at 235).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 404.1527(e). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).  The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. § 404.1517.  Under the regulations,

however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.     Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig,* 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id*. (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the Fourth Circuit's "pain rule," it is well established that "subjective complaints of pain and physical discomfort can give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman*, 829 F.2d at 518.  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject

14

of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).

The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR 88-13 ), Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02 (Aug. 6, 1990), *superseded by* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996) ("If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms."); *see* 20 C.F.R. § 416.929(c)(1)–(c)(2).

## VI.     Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique

advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Medical History

On January 20, 2004, the alleged onset date of disability, Plaintiff was struck on the right side of his head while working as a grinder.  [R. 194, 554, 559.]  The force of the blow knocked him to the floor and cracked his dentures [R. 194, 554.]  He was hospitalized for a few days, but initial and repeated CT scans of his head were normal without evidence of acute trauma or other abnormality.  [R. 194, 259–61.]  MRI imaging of the brain with MR angiography on January 22, 2004 revealed non-specific findings in the white matter consistent with small vessel ischemic disease, not discrete trauma.   [R. 194, 262.]   An EEG study was described as being normal.  [R. 194, 668.]  Records, in conjunction with Plaintiff's reports, indicated that Plaintiff continued to experience difficulty, primarily centering around chronic headache pain. [R. 194, 551–52.]  Plaintiff was evaluated, treated, and followed as an outpatient by two separate neurologists, Drs. Breeden Hollis and Anthony May; both had limited success in treating Plaintiff's headache pain because it was largely refractory to pharmacological interventions.  [R. 194.]

In December 2004, Plaintiff underwent a psychological evaluation by C. David Tollison, Ph.D.  [R. 559–60.]  Plaintiff's overall mentation appeared satisfactory, and he was fully oriented with intact thought processes, grossly intact memory (except no memory of the injury itself), and no psychotic symptoms.  [R. 559.]  Dr. Tollison diagnosed a "mild" adjustment disorder with anxiety features, a possible cognitive disorder and chronic post-traumatic headaches, and assessed a global assessment of functioning ("GAF") score

16

of 70.[5]    [R. 560.]    He concluded that Plaintiff had "only a mild intensity of anxiety symptoms" and otherwise did "not exhibit psychological symptoms of significance."  [R. 560.]    The following week, Kevin Kopera, M.D., conducted an independent medical evaluation in connection with Plaintiff's worker's compensation claim.  [R. 595–96]. He observed that Plaintiff was alert and cooperative, followed directions well, and followed conversations fairly well with delayed responses at times. [R. 596.]

In February 2005, Plaintiff underwent a neuropsychological evaluation by Randy S. Petersen, Ph.D. [R. 194–97.] Plaintiff was pleasant and generally cooperative, with adequate attention and slow processing speed.  [R. 195.]  However, on two measures of symptom validity, Plaintiff scored in the "invalid" and "marginally valid" ranges and, as a result, Dr. Peterson concluded that Plaintiff was not consistently putting forth adequate effort to produce entirely valid results, and therefore the results needed to be interpreted with caution. [R. 195.] Dr. Peterson indicated the test results showed broad-based, mild-to-severe deficits ranging across multiple cognitive domains but that the validity of the findings was "questionable and these results must be considered a very conservative and minimal estimate of his abilities due to fairly dramatic pain behaviors and significant psychiatric distress, both of which appeared to contribute to difficulties sustaining effort." [R. 197.]

Beginning in mid-August 2005, following an evaluation by pain specialist Gerald M. Aronoff, M.D. [R.  651–55], Plaintiff attended a four-week pain management day program at The Rehab Center, Inc. [R. 203–43].  On admission, Plaintiff rated his pain as nine currently and ten on a bad day.  [R. 204, 237–41.]  Nevertheless, he acknowledged he did household maintenance chores, yard work, cleaning, cooking, and fishing. [R. 242.] Psychologist John Riley, Ph.D., observed that Plaintiff had cognitive deficits consistent with

---

[5]GAF scores between 61 and 70 indicate "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psych. Ass'n Diagnostic and Statistical Manual of Mental Disorders (Text Revision 2000) (DSM-IV) 32. [Doc. 7 at 3 n.3.]

his head injury, but "[n]onetheless, he demonstrat[ed] sufficient cognitive wherewithal to follow instructions and communicate adequately," and the deficits would not hinder his progress in rehabilitation.  [R. 243.]

During the last week of the pain program, Plaintiff received emergency care for a severe headache with facial pain and light sensitivity.  [R. 245–58.]  On examination, he remained alert and fully oriented, with normal speech, normal cranial nerve testing, no cerebellar findings, and no motor, sensory, or reflex deficits.  [R. 247, 257.]  A CT scan of his brain was normal. [R. 254.]  He received sedative medication and his pain improved. [R. 246, 255.]

Three days later, at the last pain program session, Dr. Riley observed that Plaintiff was "intent upon returning to work" and voiced a "strong belief in his ability to manage his health and general function effectively."  [R. 209.]   Upon discharge, Dr. Aronoff found Plaintiff's treatment course "was one of significant improvement in multiple areas," as Plaintiff was "now up all day despite complaints of daily headaches, and he was able to do his functional activities." [R. 205.] Plaintiff's pain behaviors had decreased and he was coping with his pain better until the last days of the program, when he became apprehensive about returning to work.  [R. 206.]  In any event, he was able to grasp the concepts of the program and retain instructions.  [R. 206.]  Dr. Aronoff concluded:

> Based on the fact that the patient is able to get to and from the pain program, be at the pain program for an 8-hour day and return despite his complaints of pain and fully participate in the pain program for an 8-hour day including work simulation activities, there is no medical basis to restrict him from returning to his former job if he chooses to return.

[R. 206; *see also* R. 648].  He recommended that Plaintiff wear tinted glasses at work and noted that Plaintiff would wear earplugs and padded ear coverings to block noise.  [R. 206, 648.]

In an October 2005 follow-up visit with Dr. Aronoff, the doctor noted that Plaintiff showed significant pain behavior but found no evidence of sedation, decreased mental acuity, cognitive problems, or thought problems.  [R. 650.]  Plaintiff appeared to have

18

normal attention span and concentration.  [R. 650.]  Also that month, at Dr. Aronoff's request, Ervin S. Batchelor, Ph.D., conducted a neuropsychological evaluation of Plaintiff. [R. 580–85.]  Dr. Batchelor observed that Plaintiff's motivation appeared "only fair."  [R. 582.]  Intelligence testing indicated borderline intellectual functioning and "mildly impaired" processing speed and working memory.  [R. 582.]  His attention functions were variable [R. 582], and his ability for recall of verbal information was within normal limits [R. 583]. Dr. Batchelor found that Plaintiff showed evidence of depression, which appeared to be related to his loss of functioning and pain, and that Plaintiff attempted to manage the stress primarily by avoidance.  [R. 584.]  When Dr. Batchelor administered the Test of Memory and Malingering, the raw data showed that five of five measures of malingering were "suspicious for poor motivation to perform cognitive testing."  [R. 584.]  Dr. Batchelor suspected Plaintiff "intentionally manipulated the test results in order to appear that [Plaintiff] was cognitively impaired."  [R. 584.]  Dr. Batchelor diagnosed Plaintiff with malingering of cognitive deficits, pain secondary to injury with somatization behaviors, adjustment disorder, chronic headaches, and hypertension.  [R. 584.]

In November 2005, Dr. Aronoff concluded, "[B]ased upon the evaluation at The Rehab Center in combination with the recent neuropsychological evaluation, there is no medical or psychiatric basis to prevent Plaintiff from returning to work if he so chooses." [R. 657.]

Plaintiff underwent a second independent medical evaluation by Dr. Kopera in December 2005.  [R. 592–94.]  Dr. Kopera noted that diagnostic testing for causes of Plaintiff's headaches had been "unremarkable," that he had been "consistently neurologically intact," and that, while he demonstrated cognitive deficits on neuropsychological testing, he noted that the deficits may be "effort related." [R. 593.] He estimated Plaintiff had only a five percent whole person impairment rating under the American Medical Association's Guides to the Evaluation of Permanent Impairment.  [R. 594.]

19

In February 2006, Plaintiff returned to Dr. Tollison for another psychological evaluation.  [R. 554–58.]  On examination, he was able to provide information on himself and was alert, responsive to inquiry, and fully oriented with intact associations, coherent thought processes, grossly intact memory, fluid verbalizations, and no hallucinations or delusions.  [R. 556.]  Dr. Tollison noted that Plaintiff had long been considered functionally illiterate due to poor reading test scores and had borderline intellectual functioning in view of his IQ scores.  [R. 556.]  On a self-report test, Plaintiff scored in the moderate-to-severe range for depression.  [R. 556.]  He was polite and cooperative throughout the evaluation, and reported minimal participation in social activities due to pain, though he occasionally visited with family and visitors.  [R. 556.]  He said he did not attend functions outside the home and spent his time watching television, although he periodically went fishing and drove when necessary.  [R. 556.]  He occasionally prepared sandwiches and tried to help straighten up his home, put clothes in the washing machine, and pick up items at the store. [R. 556.]  Dr. Tollison diagnosed adjustment and somatoform disorders, with a possible cognitive disorder and a GAF score of 55 to 60, indicating moderate symptoms.[6]  [R. 557.] Nevertheless, he opined that Plaintiff had a "Class 4 (marked)" impairment in activities of daily living; a "Class 3 (moderate)" impairment in social functioning; a Class 3 impairment in concentration, persistence, or pace; and a Class 4 impairment in adaptation to stressful conditions.  [R. 558.]

In May or June 2006, Carol A. Kooistra, M.D., Plaintiff's treating neurologist since January 2006 [*see* R. 690–97], completed a questionnaire in which she stated that Plaintiff's "physical brain damage" from the head injury caused emotional lability, a questionable cognitive impairment, and post-traumatic headaches.  [R. 691.]  She expected him to reach maximum medical improvement ("MMI") in two or three months and

---

[6]GAF scores between 51 and 60 indicate "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attachs) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." [Doc. 7 at 7 n.5.]

declined to assess any permanent limitations or restrictions because Plaintiff was not at MMI.  [R. 691.]

In June 2006, Plaintiff underwent a vocational rehabilitation evaluation by Rock Weldon, M.A., a vocational expert who was contacted by Plaintiff's attorney to assist Plaintiff.   [R. 198–201.]  Based on a review of the medical records and an interview with Plaintiff and Plaintiff's wife, Mr. Weldon opined that Plaintiff was unable to perform any of the work he had previously done, would not be able to perform the normal duties expected of competitive employment or to attend work on a timely and regular basis, and should be considered permanently and totally vocationally disabled.  [R. 201.]

Also that month, Dr. Tollison completed a questionnaire opining that Plaintiff's psychological problems were probably caused by and consistent with his "brain injury." [R. 202; duplicated at R. 660.]   He further opined that Plaintiff had impairments that affected his ability to return to any type of employment, i.e., impaired ability to maintain concentration over time, impaired ability to tolerate stress and demand situations; and impaired ability to respond appropriately to changes in the workplace.  [R. 202.]

In January 2007, Plaintiff told Dr. Ashton, Plaintiff's family practitioner, that Plaintiff had just won a fishing tournament that had lasted from 7:00 a.m. to 4:00 p.m., where he caught five 14-pound fish.  [R. 711.]  As of March 2007, Dr. Kooistra noted that Plaintiff's headaches occurred only three times per week.  [R. 704.]

A May 2007 Function Report indicated that Plaintiff cared for his personal needs, walked around and watered the plants, did "30-45 min[utes] of physical activity," drove to pick up his child from school, prepared simple meals, mowed the lawn with breaks, shopped for groceries for 30 minutes at a time, went fishing with friends twice a month, and went to his mother's house and doctor's appointments.  [R. 153–58.]  That same month, Plaintiff told Dr. Kooistra that his headaches had generally improved with Depakote, except he had began experiencing a persistent headache the week of his appointment with Dr. Kooistra.  [R. 738.]

21

In June 2007, state agency physician Dale Van Slooten, M.D., reviewed Plaintiff's medical records and determined that he was capable of the exertional demands of medium work, with occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds, and that he needed to avoid concentrated exposure to hazards.  [R. 720–27.] Also that month, Plaintiff told Dr. Ashton that he enjoyed competitive fishing, but had to "rest on the hour." [R. 761.]   Plaintiff reported chronic headaches (for which he wore sunglasses), low energy, insomnia, and depression.  [R. 762.]  Nevertheless, Dr. Ashton stated, "[o]verall I think he looks and feels pretty good."  [R. 762.]

In July 2007, Plaintiff underwent a consultative psychological examination by Bruce A. Kofoed, Ph.D., in connection with his application for disability benefits.  [R. 731–34.] Plaintiff denied receiving any professional mental health care and said the use of an oxygen tank helped alleviate his facial pain.  [R. 732.]  Plaintiff said he occasionally went fishing with friends, cut grass, cooked for himself, and went to the grocery store by himself, and drove fairly regularly.  [R. 732, 733.]  He was cooperative and friendly during the interview.  [R. 733.]  Dr. Kofoed observed that Plaintiff's "[e]ffort on cognitive tasks was somewhat questionable" as he was unable even to guess at the current month.  [R. 733.] Dr. Kofoed noted that performance on symptom validity measures was "somewhat questionable and one cannot rule out the possibility of exaggeration of cognitive deficits." [R. 733.]

In August 2007, Dr. Kooistra observed that Plaintiff  "generally has difficulties with a rushing headache when he first wakes up but then he showers, he takes Neurontin and his headache is gone until about 7:00 in the evening when it returns. At that time he uses the oxygen.  As a result, he is getting out more."  [R. 737.]  Also in August 2007, state agency psychologist Robbie Ronin, Ph.D., reviewed Plaintiff's records and determined that Plaintiff had an organic mental disorder (possible postconcussive syndrome), affective and anxiety disorders (history of adjustment disorder with depression and anxiety), and a personality disorder ("indications of malingering") [R. 739–46], which caused "mild" restriction of activities of daily living; "moderate" difficulties in social functioning and

concentration, persistence, or pace; and no extended episodes of decompensation [R. 749]. Dr. Ronin concluded:

> Credibility is questionable. Some providers indicate claimant is malingering or exaggerating his [symptoms]. He participates in a relatively full range of functioning. Giving the claimant the full benefit of the doubt, his impairments are severe but would not preclude the performance of simple, routine, repetitive tasks; or preclude the ability to interact appropriately with co-workers or supervisors.

[R. 751.] Dr. Ronin then completed an assessment finding Plaintiff "moderately limited" in his ability to understand, remember, and carry out detailed instructions and interact appropriately with the general public, but "not significantly limited" in the remaining 17 of 20 areas. [R. 753–55.]

In October 2007, state agency physician Seham El-Ibiary, M.D., reviewed Plaintiff's medical records and found him capable of performing the exertional demands of medium work, with no climbing of ladders, ropes, or scaffolds; occasional balancing; and no concentrated exposure to hazards such as machinery and heights. [R. 766–73.]

In February 2008, Dr. Kooistra noted Plaintiff's headaches occurred only one to two times per week. [R. 816.] There is no further record of treatment by Dr. Kooistra that year.

In February 2009, Dr. Kooistra completed a questionnaire opining that Plaintiff's "daily" headaches, dizziness, fatigue, anxiety, and depression restricted him to sitting for four hours total and standing or walking for about two hours total in an eight-hour workday; required an at-will sit/stand option and hourly 15-minute breaks; restricted him from lifting over 20 pounds occasionally; and restricted his ability to use his hands, arms, and fingers, and bend, and twist. [R. 817–19.] She further opined Plaintiff's pain would frequently interfere with his attention and concentration, that he had "marked" limitations in the ability to deal with work stress, that he would miss work more than three times per month, and that he had to use oxygen intermittently. [R. 820–22.] She stated these limitations had been present since January 2006. [R. 822.]

**Depression and Anxiety**

Plaintiff argues that the ALJ erred in not finding his anxiety and depression to be

23

"severe." [Doc. 6 at 28.] The Commissioner concedes that the ALJ failed to list these impairments as severe in his decision but argues that the error does not require reversal because the ALJ continued with the remaining steps of the evaluation, where the ALJ thoroughly considered Plaintiff's psychological symptoms, diagnoses, treatment, and limitations. [Doc. 7 at 12.] The Commissioner argues that any purported errors in not identifying *particular* impairments as severe at step two are ultimately harmless as long as the ALJ considers the effects of *all* impairments at subsequent steps, citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that ALJ's step two error was harmless in light of his discussion of the claimant's impairment when assessing the claimant's residual functional capacity).

Under 20 C.F.R. § 416.923, the ALJ must evaluate the combined severity of multiple impairments "'without regard to whether any such impairment, if considered separately, would be of sufficient severity.'" *Cook*, 783 F.2d at 1174 (quoting 20 C.F.R. § 416.923). Moreover, the ALJ must make a specific and well-articulated finding as to the effect of the combination of impairments. *Id.*; *see also Combs v. Weinberger*, 501 F.2d 1361, 1363 (4th Cir. 1974); *Hicks v. Gardner*, 393 F.2d 299, 302 (4th Cir. 1968). Thus, the issue of whether or not a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity. 20 C.F.R. § 404.1545(a)(2), (e).

A review of the ALJ's findings shows that while the ALJ did not specifically discuss depression at step three, the ALJ did discuss the symptoms associated with *affective disorders*, which are characterized by *disturbance of mood* and are accompanied by a full or partial manic or depressive syndrome.[7] *See* § 12.04 of the Listing of Impairments,

_____

[7]Plaintiff was diagnosed with affective disorder and anxiety disorder (history of adjustment disorder with depression and anxiety) by Dr.Ronin. [R. 739–46.] "By its ordinary meaning, affective mood disorder is a "mental illness" because a layperson would characterize symptoms of depression, mood swings, and unusual behavior as mental illnesses regardless of their cause. *See Saah v. Contell Corp*, 978 F.2d 1256 (4thCir. 1992). Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either

Affective disorders, 20 C.F.R., Pt. 404, Subpt. P, App. 1 (emphasis added). The level of functional limitations associated with affective disorders is assessed by evaluating criteria in paragraphs A and B of the Listings. *Id.* If the limitations in both A and B are met, then the disorder is considered severe. *Id.* The ALJ clearly discussed and evaluated the effect of Plaintiff's mental disorders under paragraph B criteria and found that the criteria for severity was not met. [R. 12–13.] Furthermore, the ALJ's residual functional capacity assessment reflects the degree of limitation found in the "paragraph B" mental function analysis. [R. 13]. Therefore, because the ALJ performed the "paragraph B" analysis that is required to assess the severity of an affective disorder that encompasses depression and used that analysis to consider Plaintiff's residual functional capacity, the Court finds that the ALJ's failure to specifically discuss depression is harmless.

Additionally, the Court finds that the ALJ's conclusion that Plaintiff's anxiety was non-severe is supported by substantial evidence. As the ALJ noted, Plaintiff denied receiving any recent treatment for anxiety. [R. 593.] In fact, Plaintiff testified that he was unsure whether he even had anxiety. [R. 30–31.] In addition, when Dr. Tollison first evaluated Plaintiff, Plaintiff said his irritability was related more to frustration than anxiety [R. 559], and Dr. Tollison found Plaintiff had "only a mild intensity of anxiety symptoms" without other psychological symptoms of significance. [R. 560.] Moreover, in determining Plaintiff's residual functional capacity, the ALJ considered the opinions of Drs. Kooistra and Tollison, which included the doctors' opinions regarding Plaintiff's anxiety. [R. 15–16.] As a result, the Court finds that the ALJ's conclusion that Plaintiff's anxiety was non-severe is supported by substantial evidence and is not in error; even if the ALJ's conclusion was in error, it is a harmless error because the ALJ's conclusion did not prevent the ALJ from considering this impairment when determining Plaintiff's residual functional capacity.

---

depression or elation. § 12.04 of the Listing of Impairments, Affective disorders, 20 C.F.R., Pt. 404, Subpt. P, App. 1 (emphasis added).

**Listed Impairments**

Plaintiff argues that the medical evidence in the record shows that Plaintiff meets Listing 12.02 – Organic Mental Disorder as well as Listing 12.04 – Affective Disorder. [Doc. 6 at 33–34]. The Court finds, however, that there is substantial evidence in the record supporting the ALJ's determination that Plaintiff's impairments did not meet or equal the criteria of any listing.

The ALJ, in making his determination, concluded that no treating or attending physician asserted that the Plaintiff's impairments meet or equal a listing. [R. 13.] Additionally, the ALJ found that the state agency medical consultants specifically considered the issue of the listings and found Plaintiff's impairments did not meet or equal a listing. [R. 13, 58, 61, 739–56.] Moreover, the ALJ conducted a "paragraph B" mental function analysis and found that Plaintiff's affective disorder was not severe, which also suggests that it does not meet the listed impairment Affective Disorder. See 20 C.F.R. § 404.1520(a)(4)(iii) ("At the third step, we also consider the *medical severity of your impairment(s)*. If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled." (emphasis added)). Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence.

**Residual Functional Capacity**

Plaintiff argues that the ALJ's decision fails to adequately consider Plaintiff's limitations caused by Plaintiff's numerous medical problems and that the decision improperly places the greatest weight on reports of state consultants versus Plaintiff's treating physicians, Drs. Kooistra and Tollison, and Plaintiff's vocational counselor, Mr. Weldon. [Doc. 6 at 42.] The Court disagrees.

The opinion of a claimant's treating physician must "be given great weight and may be disregarded *only if* there is persuasive contradictory evidence" in the record. *Coffman*, 829 F.2d at 517 (emphasis added). The ALJ was careful to analyze the findings of Drs.

26

Kooistra and Tollison in his decision in light of persuasive contradictory evidence. [R. 15–16.]

Specifically, the ALJ discounted Dr. Kooistra's 2009 opinion of physical and mental limitations, in part, by finding her conclusions inconsistent with her own examinations, objective medical evidence, progress notes, a gap in treatment, and Plaintiff's statements. [R. 15.] The ALJ discounted Dr. Tollison's opinions of mental limitations as being based on Plaintiff's subjective complaints and inconsistent with examinations, objective findings, progress notes, evidence of malingering, opinions by Dr. Aronoff, and conservative treatment. [R. 15–16.] Additionally, Dr. Tollison's opinion was afforded little weight because he was not a treating physician, and he only examined Plaintiff twice. [R. 16]. The ALJ did not specifically discuss Mr. Weldon's opinion that Plaintiff was unable to perform any of his past work or other competitive work and should be considered "permanently and totally vocationally disabled." [R. 201.] The Court finds this error on the part of the ALJ to be harmless because the ALJ does analyze Plaintiff's credible limitations in finding Plaintiff capable of other work.

The record is replete with evidence which could go either way. *See Smith*, 795 F.2d at 346 ("[I]f the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand."). Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, however, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig*, 76 F.3d at 589; *see also Edwards*, 937 F.2d at 584 n.3 (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).

**Performance of Jobs in the National Economy**

Plaintiff argues that the ALJ's findings regarding his ability to work are in error because the ALJ failed to give proper weight to the opinions of Drs. Kooistra and Tollison

27

and failed to consider all together the opinion of Mr. Weldon. Because the Court finds that the ALJ's weighing of medical opinions, in light of persuasive contradictory evidence, was properly supported by substantial evidence, the Court likewise finds that the ALJ's conclusions regarding the existence of jobs in the national economy is so supported.

**Disability Determination**

Plaintiff argues that the ALJ's finding that he was not disabled is error and not supported by substantial evidence. [Doc. 6 at 46.] Specifically, Plaintiff charges that the Physical Capacities limitations imposed by Dr. Kooistra preclude Plaintiff from all work, pursuant to the testimony of the vocational expert. [*Id.*]

The Code of Federal Regulations draws a distinction between a physician's medical opinions and legal conclusions. "Medical opinions are statements from physicians ... that reflect judgments about the nature and severity of [the claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), ... and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as "statements[s] by a medical source that [the claimant is] 'disabled' or 'unable to work.'" *Id.*§ 404.1527(e)(1). While the ALJ must give a treating physician's medical opinions special weight in certain circumstances, *Craig*, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record) (quoting 20 C.F.R. § 404.1527(d)(2)), the ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value. *See* 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to . . . [a treating physician's legal conclusions] . . . ."). The ALJ is not free, however, simply to ignore a treating physician's legal conclusions but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." SSR 96-5p, 61 Fed. Reg. 34,401-01 (July 2, 1996); *Morgan*, 142 F. App'x 716. Because the Court finds that

28

the ALJ properly evaluated the evidence in the record and provided adequate reasoning regarding his weighing of the evidence, the Court finds that the ALJ's conclusion regarding Plaintiff's disability is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court recommends that the decision of the Commissioner be affirmed.

s/Jacquelyn D. Austin
United States Magistrate Judge

April 7, 2011
Greenville, South Carolina